## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARK A. STEIN<br>7225 MacArthur Boulevard<br>Bethesda, MD  20816<br><br>        Plaintiff,<br><br>v.<br><br>KAISER ASSOCIATES, INC.<br>Suite 1300<br>1615 L Street, NW<br>Washington, D.C.  20036<br><br>KEVIN SLAYDEN<br>8024 Pebble Creek Lane West<br>Ponte Vedra Beach, FL  32082<br><br>and<br><br>LISA P. PRYOR<br>40 Loring Avenue<br>Providence, RI  02906<br><br>        Defendants. | Case No. 17-cv-00322 |

## COMPLAINT

COMES NOW Plaintiff MARK A. STEIN ("Stein" or "Plaintiff"), by counsel, and files this Complaint against Defendants Kaiser Associates, Inc. ("Kaiser" or the "Company"), Kevin Slayden ("Slayden"), and Lisa Pryor ("Pryor") (together "Defendants"), stating to the Court as follows:

## INTRODUCTION

1.　　This case arises out of Kaiser Associates, Inc. and its principal shareholders, Ms. Lisa Pryor and Mr. Kevin Slayden's, refusal to pay wages to Mr. Stein as owed to him over a long course of employment with the Company and the ultimate retaliatory and unlawful dismissal of Mr. Stein due to his steadfast insistence that he be properly and timely compensated

for his services, and his demands that the Company finally address its severe under-capitalization so that it could timely and fully pay its employees earned wages.  Moreover, as set forth more fully below, Defendants' egregious failure to comply with their basic common law and statutory obligations subject Ms. Pryor and Mr. Slayden to personal liability for Kaiser Associate Inc.'s unlawful and highly improper acts and omissions.

## THE PARTIES

2.     Plaintiff Mark A. Stein is a citizen of the State of Maryland.

3.     Defendant Kaiser Associates, Inc. is a Delaware corporation with its principal place of business at 1615 L Street, NW, Suite 1300, Washington, D.C. 20036.

4.     Upon information and belief, Defendant Kevin Slayden is a citizen of the State of Florida with an address of 8024 Pebble Creek Lane West, Ponte Vedra Beach, FL 32082.

5.     Upon information and belief, Defendant Lisa P. Pryor is a citizen of the State of Rhode Island with an address of 40 Loring Avenue, Providence, RI 02906.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.     This Court has jurisdiction over Defendant Kaiser because it is a citizen of the District of Columbia.

8.     This Court has jurisdiction over Defendant Slayden because he is a shareholder of Kaiser and has his principal place of business in the District of Columbia.

9.     This Court has jurisdiction over Defendant Pryor because she is a shareholder of Kaiser and has her principal place of business in the District of Columbia.

## BACKGROUND

### A.  Mr. Stein's Employment

10.     Kaiser is a Washington D.C. based management consulting firm that provides consulting services to both public and private sector enterprises.

11.     Stein originally joined Kaiser in December 1995 as an entry level consultant.  He left the firm in May 1999 after rising four levels in three years to become a Level I Vice President.  Stein was rehired in 2004 by the Company as a Level II Vice President.  As a Level II Vice President Stein was charged with providing management consulting services to clients, managing project delivery teams, and participating in various Company programs.

12.     When Stein received a Level II Vice President job offer to rejoin Kaiser in 2004, it was initially delivered by Defendant Slayden. He described the role Mr. Stein would play as Level II Vice President and the compensation he would receive.  Slayden described the opportunity Stein now had to ultimately make his way up to a Senior Vice President role.

13.     With the offer, Stein was given promotion criteria for promotion to a Level III Vice President, and then thereafter to a Senior Vice President ("SVP").  As a Vice President (Level II and Level III) Stein was told his compensation would be in the form of a straight salary with annual performance assessment and an associated performance based bonus.

14.     As part of that original employment offer to be a Vice President, Stein was advised that upon promotion to SVP, he would switch to a greatly enhanced and different pay model – the Company's so-called "Comp Plan" – where he could develop and run a client practice and enjoy "unlimited upside earnings potential" described by simple math of being compensated with 65% of the net profits generated by his practice subject to a nominal monthly "draw."

15.     Slayden, when providing the offer in 2004 advised Stein that as a SVP, he would receive his 65% of the net profits from his practice once his clients paid their associated invoices. Stein was advised that invoices sent by the Company were typically paid within 30 to 90 days (as the Company's standard payment terms were "net 30"), and he would at those points in time be fully paid his 65% for the work he had performed.

**B.  The Employment Agreement**

16.     When Stein determined to accept the offer for employment in February of 2014, he was presented and signed an employment agreement dated February 24, 2004, and the parties executed the agreement on February 26, 2014 ("Employment Agreement"). Paragraph 9 of the Employment Agreement calls for post-employment restrictions on Stein's ability to compete in the marketplace. When Stein reviewed these restrictions, he expressed concern about the reach of these restrictions to the executive SVP of Human Capital of the Company who was administering the agreement with Stein.  This executive represented that the Defendants understood that these restrictions were over-reaching and the Defendants expected the restrictions would be unenforceable, and the Company would negotiate more equitable terms in good faith in the event of a separation between the parties.  Stein relied on this representation and signed the agreement.

17.     Paragraph 17 of the Employment Agreement calls for all disputes between the parties to be settled through arbitration, including, but not limited to, statutory claims for unpaid wages, that are long since overdue.

18.     An arbitration agreement is invalid if arbitration would be prohibitively expensive essentially blocking the plaintiff from effectively vindicating his statutory rights.  While the

threshold issue of arbitrability can be delegated to the arbitrator, a court can nonetheless decide the issue of arbitrability if the delegation provision itself is invalid.

19.     A delegation provision is invalid if arbitrating the arbitrability of the arbitration agreement would be prohibitively expensive, thereby preventing the plaintiff from effectively vindicating his statutory rights.  As described herein, Defendants are currently over two years in arrears of paying Plaintiff the wages he has earned.  They have also recently wrongfully and unlawfully terminated his employment which result in him loosing the base level compensation he received while employed.  Plaintiff is currently without sufficient net assets to meet his financial obligations necessary to support his family and pay the costs for arbitrating the arbitrability of the agreement.

20.     Therefore, because arbitrating the arbitrability would be prohibitively expensive for Plaintiff, the delegation provision itself is invalid and the court has the authority to decide the issue of arbitrability.

**C.  Kaiser's Failure to Lawfully Pay Wages**

21.     When Stein was promoted to SVP, effective August 1, 2007, he was advised that he would be compensated in accordance with Kaiser's "Comp Plan."  Under the Comp Plan, as noted above, Stein was told he was entitled to 65% of net profits of his client work and the Company's shareholders (the individual Defendants) would be paid a 35% dividend from the same net profits generated.

22.     Stein eventually received a short document titled "Compensation and Equity Plan Overview" that provided six short bullets describing the Comp Plan. Closing bullet number six describes payout of earnings beyond the draw and said (in full):  *"4-6 month payout timing target for earnings above draw."*

23.     In Stein's first three months after being promoted to SVP, his earnings according to the Company's Comp Plan (August, September and October of 2007) reflected that he had earned a total of $248,765 (65% of the profits Stein generated), which was subject to his draw of $47,500 for that same cumulative 3-month period, with the net due to Stein for those initial three months being $201,265.

24.     Given Stein's original expectations based on what was shared with him prior to accepting his job in 2004, and given what was outlined in the document provided on the Comp Plan, Stein expected to be paid for those earned wages no later than the close of the 2007 calendar year.

25.     Unfortunately for Stein, the first payout for those wages earned in just the first three months of his employment as an SVP were not received until over a year later on December 2008.  Sixteen months transpired between the time Stein earned these wages, and over a full year beyond when the work had been fully performed, accepted and paid for by the clients.

26.     Moreover, that first payment made 16 months later was for $33,544, not the $201,265 due for that initial 3-month period in 2007.

27.     Even more exasperating, Stein's second payment for those first three months as an SVP (earned August-October 2007), was not made until December 2009 (another 12 months after the first long overdue and shorted wage payment).  This payment was only for $3,600.

28.     In those intervening 28-months Stein earned additional wages and unpaid and accumulating as past due wages.

29.     The third payment for Stein's initial (i.e., first three-months) of Comp Plan wages were not received by Stein until July 2, 2010 - a full 35 months after Stein earned these wages, and many quarters after the Company collected the associated profits.

30.     By December 31, 2010, the Company had neglected to pay Stein past due wages totaling $1,190,461.  By December 31, 2010 Stein had earned $1,360,694 on the Company's Comp Plan more than his draw, but had been paid a cumulative $165,377 more than his draw since the first month he became an SVP back in Aug 2007.

31.     By December 31, 2010 these net unpaid wages due to Stein were behind by 36 months from when they were owed, a far contrast from the representations made to Stein by the Defendants.

32.     As of December 31, 2011, the net unpaid wages due to Stein were $1,671,417 and 18 months late.

33.     Neither Stein, nor any of the other SVPs (between 5 and 8 SVPs over the years that Stein was an SVP), have received a more complete written description of the "plan" despite making repeated demands for greater documentation.  Over these years (2007-2017) the Defendants applied various unilateral changes to how the Company calculated Comp Plan earnings.  These various changes were made at the Defendants' sole discretion.

34.     Regardless of the many rationales Defendants used to explain its practices, the fact of the matter is that Defendants' mandatorily applied practice of late payment of wages. Further, Defendants' "queue" system constitutes a contract of adhesion, and was arrived at by undue influence.

**D.  Kaiser's Severe Undercapitalization**

35.     Throughout his term of employment as an SVP, Stein took his frustrations and regrets to the Company's CFO and owner, Defendant Slayden, and made numerous inquiries to the Company's various Controllers who were in that position at times during Stein's tenure as an SVP.  Stein learned that all payments under the "Comp Plan" were made subject to Kaiser's so-

called "queue" – a payment scheme managed at the full ad-hoc determination and discretion of the Defendants.

36.     Stein never received any formally prepared financial statements from any outside accounting firm for any period during his tenure as an SVP despite making pleas and repeated requests that the Company and its SVP creditors would be well served to have a proper set of audited, or reviewed or, at least compiled, financial statements prepared by an accounting firm.

37.     Stein eventually discovered that he was subject to charges for company expenditures that were unrelated to the period of service that Stein was a SVP.  By way of example, he has his wages reduced for his apportioned share of  upfront fixed asset build out costs associated with the Company's new long-term property leases, and payments of Company obligations generated in periods prior to Stein's employment as an SVP.

38.     Over time, it became clear to Stein that Kaiser's compensation queue was driven by the fact that the Defendants had allowed the Company to become severely undercapitalized.

39.     In 2008, the Company's Controller, when pressed by Stein for an explanation for why he was not being paid, advised Stein that the Company had been functionally insolvent for a long time – having many more dollars owed to SVPs for past wages earned than the Company had in total realizable assets.

40.     A further explanation that the Controller provided was that that the Company was using its cash collections of current profits to pay out long outstanding obligations of wages unpaid to SVPs from prior years, operating a recurring cycle of *"robbing Peter, to pay Paul."*

41.     In disbelief, Stein pressed further and in that same discussion and was provided with a copy of a set of audited financials of the Company prepared by the CPA firm Argy, Wiltse & Robinson for the period ending December 31, 2005. This was a period that preceded the dates

that Stein was an SVP with the Company.  These financial statements showed that the Company had a $3,912,435 receivable on its Balance Sheet from an affiliated entity – Kaiser Associates International, Inc. – that was also owned by the Defendants Pryor and Slayden. The Controller further explained to Stein one of the main reasons that the Company did not have sufficient cash in hand to properly pay its SVPs was the result of the Company using its profits over a number of years to cover the losses of this other company owned by the Defendant Pryor and the Defendant Slayden.

42.     To prove his point, the Company Controller then shared with Stein another set of Audited financials prepared by the same CPA firm for the period ending December 31, 2006 and pointed to the fact that the receivable owed to the Company by the affiliated entity was now up to $4,128,051 increasing a few hundred thousand dollars in that intervening year.  The Controller further explained that this was a continued ongoing practice of Defendants Pryor and Slayden.

43.     To make matters worse, the Controller then shared with Stein that the Defendants Pryor and Slayden were distributing 35% of profits as payments to themselves regardless of the large outstanding balances owed to the SVP employees, including Stein, at any point in time.

44.     Stein was never able to personally verify with any certainty the true and full history of what created this unjust backlog of not making payments of wages when earned.  Nor was he ever provided any reasonable or valid explanation of why he was not being paid his wages when earned (or at least shortly thereafter).

45.     Stein was also never provided any reasonable explanation of why the Defendants continued its ongoing and long standing practice of paying wages owed at their convenience and sustaining this operating model of paying several years in arrears.

46.     Stein was also never provided any reasonable explanation of why the Defendants were taking out large dividend distributions for themselves while leaving large outstanding balances of unpaid wages to SVP employees (including Stein).

47.     Stein was made very aware that he was only an at-will employee, and understood that he was forcibly serving as an unwitting lender to the Defendants without any practical form of control.  He was essentially providing a line of credit against his will and without any ceiling on growing amounts, without any compensation or interest for these outstanding amounts owed, and without any collateral or securitization for these unpaid wages.  Stein's situation was described to him by a co-worker as being as being stuck inside a Ponzi scheme, where one is subject to getting paid only if he or she continue to feed the Ponzi (by continuing to produce).

48.     Moreover, Stein established himself as a top earner in the Company having built up a successful practice through the economic recession of 2008-2010. Three of the other eight SVPs had left the firm since Stein became an SVP in 2007, leaving only five of SVPs to produce and carry the firm. Being the highest producer in the Company, Stein's "queue" was the largest single balance of unpaid wages and Stein came to believe that if he left the firm he was materially putting at risk his ability to collect these monies owed to him.

49.     All of the pressure that Stein could muster as an employee to express to the Defendants that they needed to resolve this intolerable state was met with nothing more than weak excuses and periodic empty promises to address the issue. When Stein, at one point, made the specific suggestion to Defendant Slayden that the Company obtain a loan from a bank and bring the other SVPs and Stein himself current, the response from Defendant Slayden was that as an owner of the Company, and its CFO, he would never allow the Company to take out a bank loan because he did not believe it was a wise way for a professional service firm to operate, and

did not believe in debt. Stein found this response incredulous given the irony of the large debt

that Stein was forced to unwittingly carry because of the Defendants' total refusal to contend

with the Company's broken balance sheet.

50.     As only one example of very many similar promises and commitments is an email

from the Defendant Slayden in which he, on January 5, 2012, sent an email to all SVPs which

promised a January 2012 payout that would bring the queue down: *"This payout [Jan 2012] will

take us to under a 12-month queue by the end of this month."*

51.     In actuality, when the 2012 year ended, the balance of Stein's unpaid wages (net

of his draw) outstanding and overdue was $1,794,389 and some 21 months in arrears.

52.     According to a balance sheet of the Company as of September 30, 2015 that was

recently provided to Stein, the Company had $7,175,429 in wages debt balance due to SVPs, and

had another $3,863,692 accrued on the books for monies "owed" to the shareholders for their

35% dividend. On September 30, 2015, the Company had a cash balance approaching zero (i.e.,

the Company, by practice, never maintained a cash or other liquid asset balance of any

significance) and only had receivables from clients of approximately $3,750,000 (as of

9/11/2015 Accounts Receivable was $4,161,163 and as of 10/15/2015 Accounts Receivable was

down to $3,326,164). Given that the Company had no other real assets (other than maybe a little

cash and modest pre-paid expenses such as a rent deposit with landlord), and given the fact the

Company also had additional liabilities (e.g., trade payables, a ~$440,000 amount due to another

employee for a retirement commitment) the Company was operating in an ongoing state of

severe insolvency, forcing employees to continue to fund its broken balance sheet with growing

and on-going deferral of payment of their earned wages from prior periods.

53.     Jumping to December 30, 2015, Stein's unpaid wages (net of his draw) had grown to $2,247,950 and was 19 months in arrears. Stein's $2,247,950 balance represented 31% of the outstanding wages owed to all eight SVPs that were employed by the Company as of December 30, 2015.

54.     In the Fall of 2014, Stein believed he was successful in compelling the Defendants to finally address this issue as the Defendants agreed to hire an accounting firm, Baker Tilly, to serve as an advisor to bring forward a solution to paying the unpaid wages to the non-owner SVPs.  In the early stages of discussion with Baker Tilly, Stein was encouraged that an outside party could help finally bring the issues to a proper and necessary complete resolution.

**E.  Stein's Unlawful and Retaliatory Termination**

55.     Over time the discussions soon proved frustrating as the early signs of willingness to fully address the Company's severe under-capitalization were showing signs of significant regress. By the summer of 2016, an initial proposal was finally presented by the Defendants which proved to only address the issues on an inferior basis.  Given his personal accounting background (Stein was certified in the early 1990s as a CPA by the District of Columbia), Stein quickly recognized the great inconsistencies and weaknesses of the proposal and provided feedback to the Defendants in meetings with the other SVPs.  Feedback was formally prepared and presented by a group of five SVPs, including Stein, to the Defendants in the late summer of 2016 that communicated the disappointment of the SVPs and significance of the shortfalls of the proposal in addressing the Company's structural financial shortfalls.

56.     In the Fall of 2016, several of the SVPs reported to Stein that the Defendants made strong and clear inferences that they (the Defendants) were interested in terminating or

pushing out Stein.  Stein received warnings from these SVPs to not be surprised if actions of this nature surfaced soon.

57.     Later that Fall of 2016, the SVPs received notice from the Defendants that they would soon be receiving a 'take it or leave it" proposal for addressing the Company's "queue" and lack of equity participation beyond the current equity owners.

58.     The SVPs were eventually told that they would be receiving a final and best offer from the Defendants to address SVP concerns on Monday January 30, 2017.

59.     Then, just three business days prior to this long anticipated presentation of a proposal to finally and supposedly resolve SVP concerns, Stein was surprised by the Defendants with a notice of termination provided on a telephone call on Wednesday evening, January 25, 2017.  When pressed for an explanation for his termination the Defendants explained to Stein that they had determined that the gap between his demands and their willingness to meet his demands was too great, and they had therefore decided to terminate his employment.

60.     Stein has not been presented with payment of his outstanding wages as of the date of this Complaint – February 23, 2017, equal to $1,793,000.


## COUNT I

## Failure to pay Wages in Violation of D.C. Wage Payment and Wage Collection Law and in Violation of The Wage Theft Prevention Amendment Act of 2014
## D.C. Code Ann. § § 32-1301 to 32-1310 (Against all Defendants)


61.     The Wage Theft Prevention Amendment Act of 2014 amended the D.C. Wage Payment and Wage Collection Law in three ways: (i) executive professionals who were previously exempt from the law now have the same rights and protections that lower level non-exempt employees have; (ii) the "safe harbor" provision which had previously provided

13

employers with certain protections when there was a bona fide dispute was eliminated; and (iii) penalties for employers who fail to comply with the law were significantly increased.

62.    All employees in the District of Columbia must be paid on regular paydays at least twice a month.

63.    All employees in the District of Columbia must be paid in an interval of not more than 10 working days from the end of any pay period in which said compensation was earned.

64.    Plaintiff had therefore been entitled to receive all his wage payments within 10 days of providing his services to the Defendant Kaiser.

65.    Moreover, all employees in the District of Columbia must receive their final paycheck on the next working day following their termination.

66.    Plaintiff was therefore entitled his final wages on the next working day following the day of Plaintiff's termination.

67.    These aforementioned statutory rights cannot, as a matter of law, be waived. The Defendants cannot force the Plaintiff to accept terms that in any way deny or delay payment of his wages.

68.    Defendants failed to comply with the above obligations to provide timely wage payments under the statutory requirements of the D.C. Wage Payment and Wage Collection Law.

69.    The Plaintiff is entitled to additional penalties including, but not limited to, treble the unpaid and any late paid wages during the term of his employment.

70.    The Plaintiff is entitled to additional penalties including, but not limited, to attorneys' fees as a result of Defendants failure to comply with the D.C. Wage Payment and Wage Collection Law.

71.    Defendants failure to pay properly under the D.C. Wage Payment and Wage Collection Law were willful and negligent and are subject to civil and criminal penalties. Defendant Kaiser is subject to loss of its D.C. business license.

72.    Defendants Pryor and Slayden are *per se* personally liable for violations under the D.C. Wage Payment and Wage Collection Law.


## COUNT II

### Retaliation in Violation of D.C. Wage Payment and Wage Collection Law
### D.C. Code Ann. § § 32-1301 to 32-1310 (Against all Defendants)

73.    Defendants wrongfully terminated Plaintiff's employment in retaliation for Plaintiffs attempts and efforts to enforce his rights in accordance with the D.C. Wage Payment and Wage Collection Law.

74.    Even if a court was to determine that the Defendants' compensation queue did not violate the D.C. Wage Payment and Wage Collection Law, an employee who raises a good faith complaint about whether he was terminated in retaliation for raising a wage complaint need not be right as to whether his right to wages were in fact violated.  He need only show that he had a good faith belief that he was owed wages.

75.    Plaintiff is therefore entitled to reinstatement, back-pay, and front-pay in addition to civil penalties and liquidated damages in an amount equal to the civil penalties.

76.    Defendants Pryor and Slayden are *per se* personally liable for retaliating against Plaintiff in violation under the D.C. Wage Payment and Wage Collection Law.

## COUNT III

### Breach of Contract (Against Defendant Kaiser)

77.     Plaintiff realleges and incorporates by reference the allegations set forth above.

78.     The Employment Agreement is a binding contract that creates enforceable obligations on behalf of Plaintiff and both Defendants.

79.     Defendants have breached those obligations and duties arising out of the contract, including, but not limited to, those set out in Paragraph 3 of the Employment Agreement (Compensation).

80.     Plaintiff has suffered significant damages as a result of said breaches.

## COUNT IV

### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants)

81.     Plaintiff realleges and incorporates by reference the allegations set forth above.

82.     Defendants have a covenant of good faith and fair dealing to properly and timely compensate the Plaintiff for his work.

83.     Moreover, Defendants have an obligation to not improperly terminate his employment for demanding just and fair and timely compensation for his work.

84.     Defendants have breached these obligations and duties of good faith and fair dealing.

85.     Plaintiff has suffered significant damages as a result of said breaches.

16

## COUNT V

### Quantum Meruit Alternative Claim (Against All Defendants)

86.    Plaintiff realleges and incorporates by reference the allegations set forth above.

87.    Plaintiff provided Defendants with valuable services.

88.    Such services were accepted and enjoyed by Defendants.

89.    Plaintiff is entitled to just and timely compensation for the services that Defendants had accepted and enjoyed.

## COUNT VI

### Declaratory Judgment That Restrictive Covenants Are Unenforceable as a Matter of Law (Against Defendant Kaiser)

90.    Plaintiff realleges and incorporates by reference the allegations set forth above.

91.    The Employment Agreement is a binding contract that creates enforceable obligations on behalf of Plaintiff and Defendants.

92.    Under Paragraph 3 of the Employment Agreement, the Company is obligated to compensate the Plaintiff in accordance with the compensation plan agreed to by the parties.

93.    Defendants have failed to compensate Plaintiff in accordance with the Employment Agreement and in accordance with the laws of the District of Columbia.

94.    The failure to properly compensate Plaintiff constitutes a substantial failure to perform as a matter of contract and law.

95.    The failure to perform caused Plaintiff substantial harm.

96.    The failure to perform deprived Plaintiff a substantial benefit he reasonably expected.

97.     Plaintiff's obligations under Paragraph 9 of the Employment Agreement (Non-Competition and Non-Solicitation) are discharged as a result of Defendants' failure to properly compensate Plaintiff.

## COUNT VII

### Fraud (Against All Defendants)

98.     Plaintiff realleges and incorporates by reference the allegations set forth above.

99.     Defendants made numerous false representations related to material facts concerning Plaintiff's employment and compensation.

100.     Defendants made such representations with knowledge of their falsity and with the intent to deceive Plaintiff.

101.     Specifically, as set forth above, Defendants repeatedly advised Plaintiff that he would be paid in compliance with his rights, but then failed to make such payments.

102.     Plaintiff performed services and provided Defendants with other valuable rewards in reliance upon Defendants false and fraudulent representations.

103.     Plaintiff has suffered significant damages as a result of these false and fraudulent representations.

## COUNT VIII

### Negligent Misrepresentation (Against All Defendants)

104.     Plaintiff realleges and incorporates by reference the allegations set forth above.

105.     Defendants negligently communicated false representations to Plaintiff regarding the timing of payments for wages earned.

106.     Defendants negligently communicated false representations to Plaintiff regarding reasoning for not making timely payments for wages earned.

107.     Defendants negligently communicated false information to Plaintiff regarding the queue payment scheme that Plaintiff was forced to be subject to.

108.     Defendants should have recognized that Plaintiff would likely be imperiled by actions taken and reliance upon these misrepresentations.

109.     Plaintiff reasonably relied upon these misrepresentations to his detriment.

110.     Plaintiff has suffered significant damages as a result of said negligent misrepresentations.


## COUNT IX

### Promissory Estoppel (Against All Defendants)

111.     Plaintiff realleges and incorporates by reference the allegations set forth above.

112.     Defendants made a promise that Plaintiff would be fairly and timely compensated and that the Company would address issues related to the deficient timeliness of past payments and the insufficiency of the Company's capital reserves.

113.     Plaintiff relied on these promises to his detriment.

114.     Plaintiff has suffered significant damages as a result of his reliance on said false promises.


**WHEREFORE**, Plaintiff, by counsel, respectfully requests that this Court enter judgment against the Defendants and grant the following relief:

(a)     an award of damages in an amount in excess of $10 million to be proven at trial against Defendants;

(b)      a declaratory judgment that Plaintiff's obligations under Paragraph 9 of the

Employment Agreement (Non-Competition and Non-Solicitation) are discharged;

(c)      an award for punitive damages;

(d)      an award of pre-judgment and post-judgment interest, costs and attorneys' fees

against Defendants;

(e)      a determination that Defendant Pryor and Defendant Slayden's failure to comply

with the necessary corporate formalities, their intermingling of funds between corporate entities,

their domination and control of the Company, their inadequate capitalization of the Company,

and their diversion of corporate funds for their own personal gain, shall result in the piercing of

the Company's corporate veil to extend personal liability, jointly and severally, to Defendant

Pryor and Defendant Slayden; and

(f)      an award of such other and further relief as the Court deems just and proper

Date: February 23, 2017                              Respectfully submitted,


/s/  Ari Micha Wilkenfeld
Ari Micha Wilkenfeld (D.C. Bar No. 14006)
ari@wilkenfeldlaw.com
Wilkenfeld, Herendeen & Atkinson
1731 Connecticut Avenue, NW, Third Floor
Washington, D.C.  20009
Tel:  (202) 765-2253
Fax:  (202) 600-2792

Todd A. Bromberg (D.C. Bar No. 472554)
tbromberg@wileyrein.com
Wiley Rein LLP
1776 K Street NW
Washington, D.C. 20006
Tel:  (202) 719-7000
Fax:  (202 719-7049

*Counsel for Mark A. Stein*